**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ZACHARY CHERNIK, on behalf of himself and all others similarly situated, | Case No.: |
| Plaintiff, | |
| v. | |
| AT&T, INC. and DIRECTV, | |
| Defendants. | **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Zachary Chernik ("Plaintiff"), by and through the undersigned counsel, bring this class action against Defendant AT&T, Inc. and Defendant DirecTV (collectively, "AT&T" or "Defendants") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsels' investigation, and upon information and belief as to all other matters, as follows:

## SUMMARY OF ACTION

1.      Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard sensitive information of their customers.

2.      AT&T is one of the largest wireless carriers and internet providers in the country.

3.      Nearly three years ago, AT&T learned that a well-known threat actor claimed to have made the personal information of over 70 million AT&T customers available for purchase. The information included customers' names, addresses, phone numbers, Social Security numbers, and dates of birth. Rather than investigate this massive breach, AT&T denied the allegations, ignored the issue, and continued their status quo operations. It insisted to the media that "the

1

information that appeared in an internet chat room does not appear to have come from our systems."[1] And it refused to answer questions about the breach posed by vendors: "Given this information did not come from us, we can't speculate on where it came from or whether it is valid."[2]

4.      Nearly three years later, and that same customer data posted online in 2021 is now fully exposed on the Dark Web. AT&T no longer denies its involvement: it has finally admitted that approximately 73 million former and current AT&T customers had their personal and sensitive information posted on the Dark Web (the "Data Breach").

5.      AT&T now states that customers' impacted information includes a combination of their "full name, email address, mailing address, phone number, social security number, date of birth, and AT&T account number and passcode" (collectively, "Personally Identifiable Information" or "PII"), which AT&T collected as a condition for use of its services.

6.      Plaintiff's and Class Members' sensitive personal information—which they entrusted to Defendants with the mutual understanding that Defendants would protect it against disclosure—was targeted, compromised, and unlawfully accessed due to the Data Breach.

7.      AT&T collected and maintained certain PII of Plaintiff and the putative Class Members (defined below), who are (or were) customers of Defendants.

8.      The PII compromised in the Data Breach was exfiltrated by cyber-criminals who target PII for its value to identity thieves and remains in the hands of those cyber-criminals.

---

[1] Lawrence Abrams, *AT&T Denies Data Breach After Hacker Auctions 70 Million User Database*, BleepingComputer        (Aug.        20,        2021,        9:43AM), https://www.bleepingcomputer.com/news/security/atandt-denies-data-breach-after-hacker-auctions-70-million-user-database/.

[2] *Id.*

9.      As a result of the Data Breach, Plaintiff and approximately 73 million Class Members (including 7.6 million current customers and 65.4 million former customers)[3], suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

10.     The Data Breach was a direct result of Defendants' failure to protect consumers' PII from a foreseeable and preventable cyber-attack by implementing adequate and reasonable cyber-security procedures and protocols.

11.     Indeed, AT&T appears ignorant of the source of the breach nearly three years after the Data Breach occurred. Rather than conduct a thorough investigation into the data leak, AT&T chose to remain willfully blind and left 73 million customers unable to adequately protect themselves.

12.     Moreover, upon information and belief, Defendants were targeted for a cyber-attack due to their status as telecommunication and television companies that collect and maintain highly valuable PII on their systems.

---

[3] Aimee Ortiz, *AT&T Resets Millions of Passcodes After Customer Records Are Leaked*, N.Y. Times (Mar. 30, 2024), https://www.nytimes.com/2024/03/30/business/att-passcodes-reset-data-breach.html.

13.     Defendants maintained, used, and shared the PII in a reckless manner. In particular, the PII was used and transmitted by Defendants in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the PII from those risks endangered that property.

14.     Defendants disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure their data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

15.     Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct because the PII that Defendants collected and maintained has been accessed and acquired by cyber criminals and identity thieves.

16.     Armed with the PII accessed in the Data Breach, these threat actors have already engaged in identity theft and fraud and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest, among other crimes.

17.     As a result of the Data Breach, Plaintiff and Class Members face a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

18.     Plaintiff and Class Members may also incur out of pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

19.     Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendants' inadequate safeguarding of Class Members' PII that they collected and maintained, and for failing to timely and adequately notify Plaintiff and other Class Members that (1) their information had been subject to the unauthorized access by an unknown third party, or (2) precisely what specific type of information was accessed.

20.     Through this Petition, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose PII was accessed during the Data Breach.

21.     Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## PARTIES

22.     Plaintiff Zachary Chernik is a citizen and resident of Woodstock, Illinois, whose PII was compromised from AT&T.

23.     Defendant AT&T, Inc. is a Delaware corporation with its principal place of business in Dallas, TX.

24.     Defendant DirecTV is a Delaware corporation with its principal place of business in El Segundo, California.

5

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 members in the proposed class; and at least one member of the class is a citizen of a state different from Defendants.

26.     This Court has jurisdiction over Defendant AT&T, Inc. because AT&T, Inc. has committed acts within the Northern District of Illinois giving rise to this action, and has established minimum contacts with this forum such that the exercise of jurisdiction over AT&T, Inc. would not offend traditional notions of fair play and substantial justice. AT&T, Inc. has engaged in continuous, systematic, and substantial activities within this State, including substantial marketing and sales of services and products in connection with the Data Breach within this State.

27.     This Court has personal jurisdiction over Defendant DirecTV because DirecTV has committed acts within the Northern District of Illinois giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over DirecTV would not offend traditional notions of fair play and substantial justice. DirecTV has engaged in continuous, systematic, and substantial activities within this State, including substantial marketing and sales of services and products in connection with the Data Breach within this State.

28.     Venue is proper under 18 U.S.C § 1391(b)(2) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

*Defendants' Business*

29.     With 241.5 million subscribers as of December 2023, AT&T, Inc. is one of the largest wireless carriers and internet providers in the country.

30.     Similarly, DirecTV is one of the largest traditional pay-TV services, with around 11.3 million subscribers as of 2023.[4]

31.     AT&T, Inc. acquired DirecTV on July 24, 2015.[5] At the closing of the acquisition, DirecTV became a wholly owned subsidiary of AT&T, Inc.[6]

32.     On August 2, 2021, AT&T, Inc. spun off DirecTV into an independent company that owns and operates DirecTV, AT&T TV, and U-Verse video services.[7]

33.     Plaintiff and Class Members are current and former customers of Defendants.

34.     In connection with its TV and video services, Defendant requires customers, including Plaintiff and Class Members, to provide personal information, including at least the following: names, dates of birth, phone numbers, Social Security numbers, and other sensitive information.

35.     Upon information and belief, Defendants promised to provide confidentiality and adequate security for the data it collects from customers, including Plaintiff, through their

---

[4] Julia Stoll, *Number of DirecTV Video Subscribers in the United States from 2nd Quarter 2014 to 4th Quarter 2023*, Statista (Mar. 11, 2024), https://www.statista.com/statistics/497288/directv-number-video-subscribers-usa/.
[5] *Cost Basis Guide: Information on Prior Acquisitions*, AT&T, https://investors.att.com/stockholder-services/cost-basis-guide/acquisitions/directv (last visited Apr. 10, 2024).
[6] *Id.*
[7] Press Release, AT&T, DIRECTV to Own and Operate Former AT&T Video Operations (Aug. 2, 2021), https://about.att.com/story/2021/att_directv.html.

applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

36.     Indeed, AT&T, Inc. provides on its website that:

> We work hard to safeguard your information using technology controls and organizational controls. We protect our computer storage and network equipment. We require employees to authenticate themselves to access sensitive data. We limit access to personal information to the people who need access for their jobs. And we require callers and online users to authenticate themselves before we provide account information.[8]

37.     Plaintiff and the Class Members, as customers of Defendants, relied on these promises and on these sophisticated business entities to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Consumers, in general, demand security to safeguard their PII, especially when their Social Security numbers and other sensitive PII are involved.

### *The Data Breach*

38.     In or about March 2024, 73 million former and current AT&T customers had their PII leaked online, including full names, email addresses, mailing addresses, phone numbers, dates of birth, Social Security numbers, AT&T account numbers, and passcodes.[9]

39.     "Details of the leaked data first appeared online in August 2021, when a known threat actor, ShinyHunters, offered up the records for sale on a hacking forum, with a 'buy it now' price of one million dollars."[10] In March 2024, "that same data appears to have been made available for free by another threat actor, MajorNelson."[11]

---

[8] *AT&T Privacy Notice*, AT&T (Dec. 11, 2023), https://about.att.com/privacy/privacy-notice.html.
[9] Ortiz, *supra* note 3.
[10] *Id.*
[11] *Id.*

40.    The FTC Act, contract, common law, and industry standards obligate Defendants to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

41.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed. This failure caused the exposure of AT&T customer PII.

42.    The attacker accessed and acquired files Defendants shared with a third party containing unencrypted PII of Plaintiff and Class Members. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

43.    Plaintiff further believes that his PII and that of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

***Data Breaches Are Preventable***

44.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

45.    Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

46.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[12]

---

[12]    How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

47. To prevent and detect cyber-attacks and/or ransomware attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[13]

48.    To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall

---

[13] *Id.* at 3-4.

- Enable tamper protection

- Enable cloud-delivered protection

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[14]

49.    Given that Defendants were storing the PII of their current and former customers, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

50.    The fact that the Data Breach occurred indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the PII of more than seventy million individuals, including that of Plaintiff and Class Members.

### Defendants Acquires, Collects, And Stores their Customers' PII

51.    Defendants acquire, collect, and store a massive amount of PII on their current and former customers.

52.    As a condition of obtaining products and/or services at Defendants, Defendants require that customers and other personnel entrust it with highly sensitive personal information.

53.    By obtaining, collecting, and using Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' PII from disclosure.

---

[14] *See* Microsoft Threat Intelligence, *Human-Operated Ransomware Attacks: A Preventable Disaster*, Microsoft Security (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

54.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII, and they would not have entrusted it to Defendants absent a promise to safeguard that information.

55.     Upon information and belief, in the course of collecting PII from customers, including Plaintiff, Defendants promised to provide confidentiality and adequate security for their data through their applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

Indeed, AT&T provides on its website that:

We work hard to safeguard your information using technology controls and organizational controls. We protect our computer storage and network equipment. We require employees to authenticate themselves to access sensitive data. We limit access to personal information to the people who need access for their jobs. And we require callers and online users to authenticate themselves before we provide account information.[15]

56.     Plaintiff and the Class Members relied on Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***Defendants Knew, Or Should Have Known, of the Risk Because Telecommunication and Television Companies In Possession Of PII Are Particularly Susceptible To Cyber Attacks***

57.     Defendants' data security obligations were particularly important because cyber-attacks and/or data breaches have substantially increased, especially those targeting telecommunication and television companies that collect and store PII, like Defendants, preceding the date of the breach.

58.     Indeed, data breaches have become widespread, including those perpetrated against telecommunication and television companies that store PII in their systems.

---

[15] *See AT&T Privacy Notice*, *supra* note 8.

59.     In the third quarter of the 2023 fiscal year alone, 7,333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[16]

60.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

61.     Such cyber-attacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets to raise awareness and encourage preparation for a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals...because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[17]

62.     Additionally, as companies became more dependent on computer systems to run their business, [18] and the Internet of Things ("IoT") proliferates, the danger posed by cybercriminals is magnified. These changes highlight the need for adequate administrative, physical, and technical safeguards.[19]

---

[16] *See ITRC Q3 Data Breach Analysis,* Identity Theft Resource Center, https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/.

[17] Ben Kochman, *FBI Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019, 9:44 PM), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[18] Danny Brando et al., *Implications of Cyber Risk for Financial Stability*, FEDS Notes (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[19] Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PicusLabs (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

63.     Defendants knew and understood unprotected or exposed PII in the custody of telecommunication and television companies, like Defendants, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

64.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

65.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

66.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

67.     The ramifications of Defendants' failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen – particularly Social Security numbers – fraudulent use of that information and damage to victims may continue for years.

68.     As telecommunication and television companies in custody of the PII of their customers, Defendants knew, or should have known, the importance of safeguarding PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendants, however, failed to take adequate cybersecurity measures to prevent the Data Breach.

### *Value Of Personally Identifying Information*

69.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[20] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[21]

70.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[22] For example, Personal Information can be sold at a price ranging from $40 to $200.[23] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[24]

71.     Moreover, Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

72.     According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information

---

[20] 17 C.F.R. § 248.201 (2013).

[21] *Id.*

[22] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[23] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[24] *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

increases."[25] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[26]

73.     The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[27]

74.     In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[28] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[29] Plaintiff and Class Members are now at and increased risk of these dangers.

75.     Yet it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Put differently, preventive action to defend against the possibility of

---

[25] *See Avoid Identity Theft: Protect Social Security Numbers*, Soc. Sec., https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20 and%20use,and%20other%20private%20information%20increases (last visited Apr. 8, 2024).
[26] *Id*.
[27] *Identity Theft and Your Social Security Number*, Social Security Administration, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Apr. 8, 2024).
[28] *See How to Protect Yourself From Social Security Identity Theft*, Equifax, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited Apr. 8, 2024).
[29] *See* Julia Kagan, *What is an SSN? Facts to Know About Social Security Numbers*, Investopedia (Feb. 15, 2024), https://www.investopedia.com/terms/s/ssn.asp.

misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

76.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[30]

77.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (noting that Plaintiffs' Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives their value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks")

---

[30] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

78.     Similarly, the California Department of Justice warns consumers that "over the years, [your Social Security number] has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[31]

79.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers, dates of birth, and names.

80.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[32]

81.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing with this information, or even give false information to police.

82.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

[31] *See Your Social Security Number: Controlling the Key to Identity Theft*, St. of Cal. Dep't of Just., https://oag.ca.gov/idtheft/facts/your-ssn (last visited Apr. 8, 2024).

[32] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

83.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

### Defendants Fails To Comply With FTC Guidelines

84.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

85.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which establishes cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[34]

86.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicative of

---

[33] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf ("GAO Report").

[34] *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

hacking; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[35]

87.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

88.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

89.     These FTC enforcement actions include actions against telecommunication and television companies, like Defendants.

90.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

91.     Defendants failed to properly implement basic data security practices.

92.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII of their customers or to comply with applicable industry

---

[35] *Id.*

standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. §

45.

93.     Upon information and belief, AT&T was at all times fully aware of its obligation

to protect the PII of their customers, AT&T was also aware of the significant repercussions that

would result from their failure to do so. Accordingly, Defendants' conduct was particularly

unreasonable given the nature and amount of PII it obtained and stored and the foreseeable

consequences of the immense damages that would result to Plaintiff and the Class.

### *Defendants Fail To Comply With Industry Standards*

94.     As noted above, cybersecurity experts routinely identify telecommunication and

television companies in possession of PII as particularly vulnerable to cyberattacks because of the

valuable PII that they collect and maintain.

95.     Several best practices have been identified that, at a minimum, should be

implemented by telecommunication and television companies in possession of PII, like

Defendants. These practices include, but are not limited to: educating all employees; strong

passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software;

encryption, making data unreadable without a key; multi-factor authentication; backup data and

limiting which employees can access sensitive data. AT&T failed to follow these industry best

practices, and failed to implement multi-factor authentication.

96.     Other cybersecurity best practices that are standard include installing appropriate

malware detection software; monitoring and limiting the network ports; protecting web browsers

and email management systems; setting up network systems such as firewalls, switches and

routers; monitoring and protection of physical security systems; protection against any possible

communication system; training staff regarding critical points. AT&T failed to follow these cybersecurity best practices, including failure to train staff.

97.     Upon information and belief, Defendants failed to meet the minimum standards of one or more of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

98.     These foregoing frameworks are existing and applicable industry standards for telecommunication and television companies, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### Common Injuries & Damages

99.     As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains

backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

### *Data Breaches Increase Victims' Risk Of Identity Theft*

100.    The unencrypted PII of Plaintiff and Class Members will end up for sale on the dark web, as that is the *modus operandi* of hackers.

101.    Because unauthorized individuals can now easily access the unencrypted PII of Plaintiff and Class Members, the PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members.

102.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

103.    Plaintiff's and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

104.    State legislatures have passed laws in recognition of the risk of one's Social Security number being exposed: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[36]

---

[36] *See* N.C. Gen. Stat. § 132-1.10(1).

105.    Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[37]

106.    "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[38] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account"[39]

107.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[40]

_____

[37] *See* Husayn Kassai, *Banks Need to Stop Relying on Social Security Numbers*, American Banker (Nov. 12, 2018, 10:07AM), https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers.

[38] *See* Ann Carrns, *Just 5 Banks Prohibit Use of Social Security Numbers*, N.Y. Times (Mar. 20, 2013, 10:59 AM), https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/.

[39] *See What Can Someone Do with Your Social Security Number?*, Credit.com (Oct. 19, 2023), https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[40] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebssecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-

108.    "Fullz" packages allow cyber-criminals to cross-reference two sources of PII to join unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy. By doing so, the criminals assemble complete dossiers on individuals.

109.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

110.    Additionally, the existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like insurance information) of Plaintiff and the other Class Members—even if it was not stolen in the Data Breach.

111.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### Loss Of Time To Mitigate Risk Of Identity Theft & Fraud

112.    A reasonable person whose PII is compromised in a data breach like this one is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost by undertaking these mitigation efforts.

---

texas-life-insurance-](https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/.

113.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of uncompensated lost time—which cannot be recaptured—spent on mitigation activities.

114.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report"), in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[41]

115.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach. These include: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[42]

### *Diminution of Value of PII*

116.    PII is a valuable property right.[43] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

---

[41] *See* GAO Report, *supra* note 33.
[42] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.
[43] *See* GAO Report, *supra* note 33.

117.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[44]

118.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[45]

119.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[46,47]

120.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[48]

121.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. Yet this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, meaning they suffered an economic loss as a result. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

---

[44] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets." (citations omitted)).

[45] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[46] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. Times (Nov. 5, 2019, 5:00AM), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[47] *The Personal Data Revolution*, DataCoup, https://datacoup.com/ (last visited Apr. 8, 2024).

[48] *Computer & Mobile Panel*, Nielsen, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Apr. 8, 2024).

122.     At all relevant times, AT&T knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

123.     The fraudulent activity resulting from the Data Breach may not come to light for years.

124.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

125.     AT&T was, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to more than seventy million individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

126.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

127.     Given the type of targeted attack in this case, sophisticated criminal activity, and the type of PII involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals. These criminals intend to utilize the PII for identity theft crimes –*e.g*., opening bank accounts in the

victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

128.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her PII was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

129.    Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

130.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach.

### Loss Of Benefit Of The Bargain

131.    Furthermore, Defendants' poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendants and/or their agents for products and/or services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the PII, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received products and/or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

### Plaintiff Zachary Chernik's Experience

132.    Plaintiff Zachary Chernik is a current DirecTV customer; he has been a DirecTV customer for over twenty years, including when AT&T owned DirecTV.

133.    Plaintiff was required to provide his PII to Defendants as a condition of obtaining products and/or services from them. Upon information and belief, this PII included his name, date of birth, phone number, Social Security number, and other sensitive information.

134.    At the time of the Data Breach, Defendants maintained Plaintiff's PII in its system.

135.    On March 31, 2024, Plaintiff received an email notice letter from AT&T that his AT&T passcode had been compromised. As a result, AT&T warned him that his full name, email address, mailing address, phone number, social security number, date of birth, AT&T account number, and passcode may all have been affected by the Data Breach.

136.    Plaintiff is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendants had he known of Defendants' lax data security policies.

137.    Upon information and belief, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties. In particular, Plaintiff learned that his email address has been found on the dark web.

138.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to, work and/or recreation. This time has been lost forever and cannot be recaptured.

139.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and opportunity costs associated with

attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

140.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's occurrence.

141.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

142.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

143.    Plaintiff brings this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

144.    The Class that Plaintiff seeks to represent is defined as follows:

**Nationwide Class**
All individuals residing in the United States whose PII was accessed and/or
acquired by an unauthorized party as a result of the data breach announced by
Defendants in or about March 2024 (the "Class").

145.    Excluded from the Class are the following individuals and/or entities: Defendants

and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which

Defendants have a controlling interest; all individuals who make a timely election to be excluded

from this proceeding using the correct protocol for opting out; and all judges assigned to hear any

aspect of this litigation, as well as their immediate family members.

146.    Plaintiff reserves the right to amend the definitions of the Class or add a Class or

Subclass if further information and discovery indicate that the definitions of the Class should be

narrowed, expanded, or otherwise modified.

147.    <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members

is impracticable, if not completely impossible. Upon information and belief, more than 70 million

individuals were impacted in the Data Breach. The Class is apparently identifiable within

Defendants' records, and Defendants have already identified these individuals (as evidenced by

sending them breach notification letters).

148.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class. Among the

questions of law and fact common to the Class that predominate over questions which may affect

individual Class members, including the following:

      a.    Whether and to what extent Defendants had a duty to protect the PII of Plaintiff
          and Class Members;

      b.    Whether Defendants had respective duties not to disclose the PII of Plaintiff and
          Class Members to unauthorized third parties;

c.   Whether Defendants had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

d.   Whether Defendants failed to adequately safeguard the PII of Plaintiff and Class Members;

e.   Whether and when Defendants actually learned of the Data Breach;

f.   Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g.   Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h.   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.   Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.   Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct;

k.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

149.   <u>Typicality:</u> Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

150.   <u>Policies Generally Applicable to the Class:</u> This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the

Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

151.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

152.    Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

153.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure

to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

154.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

155.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

156.    Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the PII of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Petition.

157.    Further, Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

158.    Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Defendants failed to timely notify the Plaintiff and the class of the Data Breach;

b.   Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c.   Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.   Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

e.   Whether Defendants failed to take commercially reasonable steps to safeguard consumer PII; and

f.   Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
**Negligence**
**(On Behalf of Plaintiff and the Class)**

159.   Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

160.   Defendants requires their customers, including Plaintiff and Class Members, to submit non-public PII in the ordinary course of providing their products and/or services.

161.    Defendants gathered and stored the PII of Plaintiff and Class Members as part of their business of soliciting their services to their customers, which solicitations and services affect commerce.

162.    Plaintiff and Class Members entrusted Defendants with their PII with the understanding that Defendants would safeguard their information.

163.    Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

164.    By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

165.    Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

166.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks adequately protected the PII.

167.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between AT&T and Plaintiff and Class Members. That special

relationship arose because Plaintiff and the Class entrusted AT&T with their confidential PII, a necessary part of being customers of Defendants.

168.     Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants is bound by industry standards to protect confidential PII.

169.     Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or the Class.

170.     Defendants also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

171.     Moreover, Defendants had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

172.     Defendants had and continue to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

173.     Defendants breached their duties, pursuant to the FTC Act and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

      a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

      b.  Failing to adequately monitor the security of their networks and systems;

39

c.   Allowing unauthorized access to Class Members' PII;

d.   Failing to detect in a timely manner that Class Members' PII had been compromised;

e.   Failing to remove former customers' PII it was no longer required to retain pursuant to regulations, and

f.   Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

174.   Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

175.   Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statute was intended to guard against.

176.   Defendants' violation of Section 5 of the FTC Act constitutes negligence.

177.   The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

178.   A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

179.     It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the telecommunications and television industry.

180.     Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

181.     Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendants' systems or transmitted through third party systems.

182.     It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

183.     Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

184.     Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

185.     Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

186.     But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

187.     There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

188.     As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

189.     Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

190.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

191.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

### COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

192.    Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

193.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

194.    Defendants breached their duties to Plaintiff and Class Members under the Federal Trade Commission Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

195.    Defendants' failure to comply with applicable laws and regulations constitutes negligence per se.

196.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

197.    The harm resulting from the Data Breach was the harm the FTC Act was intended to guard against, and Plaintiff and Class Members are within the class of persons the statute was intended to protect.

198.     The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

199.     As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## COUNT III
### Breach Of Implied Contract
### (On Behalf of Plaintiff and the Class)

200.     Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

201.     Plaintiff and Class Members were required to deliver their PII to Defendants as part of the process of obtaining products and/or services at Defendants. Plaintiffs and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for products and/or services.

202.     Defendants solicited, offered, and invited Class Members to provide their PII as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their PII to Defendants.

203.     Defendants accepted possession of Plaintiffs' and Class Members' PII for the purpose of providing services to Plaintiffs and Class Members.

204.     Plaintiff and the Class entrusted their PII to Defendants. In so doing, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard

and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

205.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

206.    Implicit in the agreement between Plaintiff and Class Members and the Defendants to provide PII, was the Defendants' obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

207.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendants, on the other, is demonstrated by their conduct and course of dealing.

208.    On information and belief, at all relevant times Defendants promulgated, adopted, and implemented written privacy policies whereby they expressly promised Plaintiff and Class Members that they would only disclose PII under certain circumstances, none of which relate to the Data Breach.

209.    On information and belief, Defendants further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

210.    Plaintiff and Class Members paid money to Defendants with the reasonable belief and expectation that Defendants would use part of their earnings to obtain adequate data security. Defendants failed to do so.

211.    Plaintiff and Class Members would not have entrusted their PII to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure.

212.    Plaintiff and Class Members would not have entrusted their PII to Defendants in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

213.    Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

214.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

215.    Defendants breached the implied contracts they made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

216.    Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PII, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of PII and storage of other personal information after Defendants knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

46

217.     As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII.

218.     Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

219.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

<b><u>COUNT IV</u></b><br><b>Unjust Enrichment</b><br><b>(On Behalf of Plaintiff and the Class)</b>

220.     Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

221.     Plaintiff brings this Count in the alternative to the breach of implied contract count above.

222.    Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they paid Defendants and/or their agents for products and/or services and in so doing also provided Defendants with their PII. In exchange, Plaintiff and Class Members should have received from Defendants the products and/or services that were the subject of the transaction and should have had their PII protected with adequate data security.

223.    Defendants knew that Plaintiff and Class Members conferred a benefit upon them and has accepted and retained that benefit by accepting and retaining the PII entrusted to them. Defendants profited from Plaintiff's retained data and used Plaintiff's and Class Members' PII for business purposes.

224.    Defendants failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

225.    Defendants acquired the PII through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

226.    If Plaintiff and Class Members had known that Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would have entrusted their PII at Defendants or obtained products and/or services at Defendants.

227.    Plaintiff and Class Members have no adequate remedy at law.

228.    Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

229.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) uncompensated lost time and

opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the PII.

230.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

231.    Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendants and that the Court grants the following:

A.    For an Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

B.    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C.     For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    iv.    requiring Defendants to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

    v.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

    vi.    prohibiting Defendants from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii.   requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

viii.  requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.   requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

x.   requiring Defendants to segment data by, among other things, creating firewalls and controls so that if one area of Defendants' network is compromised, hackers cannot gain access to portions of Defendants' systems;

xi.   requiring Defendants to conduct regular database scanning and securing checks;

xii.  requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii.  requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.  requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xv.  requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.  requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect himself;

xvii.  requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

xviii.  for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's

final judgment, to provide such report to the Court and to counsel for

the class, and to report any deficiencies with compliance of the Court's

final judgment;

D.    For an award of damages, including actual, nominal, statutory,

consequential, and punitive damages, as allowed by law in an amount to be

determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by

law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: April 16, 2024                    Respectfully submitted,

*/s/ Kyle Pozan*
Kyle Pozan (IL Bar No. 6306761)
Karen Hanson Riebel*
Kate M. Baxter-Kauf*
Emma Ritter Gordon*
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401
T: 612-339-6900
kjpozan@locklaw.com
khriebel@locklaw.com
kmbaxter-kauf@locklaw.com
erittergordon@locklaw.com

MaryBeth V. Gibson\*
**GIBSON CONSUMER LAW GROUP, LLC**
4729 Roswell Road, Suite 208-108
Atlanta, GA 30342
T: 678-642-2503
marybeth@gibsonconsumerlawgroup.com

\* *Pro hac vice* applications forthcoming

**Attorneys for Plaintiff and the Proposed Class**